## Henry I. Morris v. Dixon National Bank.

1. BANKING—*What is a Legitimate Business.*—Advancing money by a bank through its cashier to a person by way of loans to him to buy grain to be shipped and sold in the name of the bank by the car lot, the person buying the grain, loading it, and upon the completion of a car load delivering a bill of lading to the bank and drawing his check upon it, the grain being his, but held by the bank on the bill of lading as security for the money advanced, he doing the shipping and selecting the person to whom the shipment is made, are all transactions recognized as a part of a legitimate banking business.

2. SAME—*What Does Not Make a Bank a Dealer on the Board of Trade.*—The fact that a bank and a person engaged in buying grain, in the course of their mutual transactions arrange that the contracts of sales for future delivery into which such person has entered shall be transferred to the bank by way of security for advances made or to be made by the bank, or that the proceeds derived from the sales of grain shipped and sold by the bank for the benefit of such person, although held as security, should be applied to his use in the protection of his contracts for future delivery, does not necessarily make the bank a dealer in board of trade options or a seller of property for future delivery.

3. QUESTION OF FACT—*Transactions Between Banks and Their Customers.*—The facts regarding transactions between a bank and its customers and as to the authority of the cashier in the premises are questions for the jury under proper instructions, and it is error to refuse to admit any evidence material to the determination of such questions.

Memorandum.—Assumpsit. In the Circuit Court of Cook County; the Hon. THOMAS G. WINDES, Judge, presiding. Declaration, common counts and affidavit of claim; pleas of general issue and set-off; trial by jury; verdict for defendant on plea of set-off; error by plaintiff. Heard in this court at the October term, 1894. Reversed and remanded. Opinion filed November 12, 1894.

BRIEF FOR PLAINTIFF IN ERROR, STEELE & ROBERTS, ATTORNEYS.

The banking act, Revised Statutes U. S., Sec. 5136, provides that a national bank shall have power—"3d. To make contracts. 4th. To sue and be sued, complain and defend in any court of law or equity, as fully as natural persons. 7th. To exercise by its board of directors, or duly authorized officers or agents, subject to law, all such incidental powers

as shall be necessary to carry on the business of banking, by its discounting and negotiating promissory notes, drafts, bills of exchange, and other evidence of debt; by receiving deposits; by buying and selling exchange coin and bullion; by loaning money on personal security; by obtaining, issuing and circulating notes, according to the provisions of the bill of this title."

It has been held that a national bank under this section has power to take warehouse receipts for grain and other commodities, and such chattels as locomotives, as security for money advanced or loaned. Pittsburgh Locomotive & Car Works v. State National Bank, 2 Cent. Law Journal, 692; Cleveland, Brown & Co. v. Shoemon, 40 Ohio 176.

Since the bank had the rye, it matters not in this suit how it came into possession of it—whether the means whereby the bank obtained possession of the rye is *ultra vires* the corporation or not. In this case, having the rye, it became an asset of the bank, and with reference to it the bank was clothed with all the incidental powers related to its possession. It could sell the same, and give a good title, upon the same principle which a national bank can convey real estate which it has acquired outside the powers of its charter, and the validity of the transaction can not be inquired into, except by *quo warranto* proceedings by the government. German National Bank v. Meadowcroft, 95 Ill. 124; National Bank v. Mathews, 98 U. S. 621; National Bank v. Whitney, 103 U. S. 99; Fortier v. New Orleans Bank, 112 U. S. 439.

Whether or not the cashier, under all the circumstances of this case, did not have the authority to bind the bank, is a question of fact to be determined by a jury. Merchants v. State Bank, 10 Wall. (U. S.) 604.

There was evidence which shows such authority. The letters of Hawley, cashier, the conversation of Hawley with Morris, and the testimony of Jason C. Ayres, president of the defendant in error, is such evidence, and its weight should have been determined by the jury. Hubner v. Feige, 90 Ill. 208, and note; Bonney v. Weir, 51 Ill. App. 380; Pemberton v. Williams, 87 Ill. 17; Dickerson v. Sparks, 17 Ill. 178; Frazer v. Howe, 16 Ill. 563; Stacy v. Cobbs, 36 Ill.

349; The People v. Nedrow, 16 Ill. App. 563; Thompson v. Hovey, 43 Ill. 197; C., R. I. & P. Ry. Co. v. Lewis, 109 Ill. 120; Pullman Palace Car Co. v. Laack, 143 Ill. 242.

The jury should have been permitted to retire and consider the evidence, with instructions in writing. Arcade v. Allen, 51 Ill. App. 305; Giddings v. Macomber, 51 Ill. App. 373–376; Greenwich Ins. Co. v. Raub, 11 Ill. App. 636; I. C. Ry. Co. v. Hammer, 85 Ill. 526; Revised Statutes, Chap. 110, Secs. 52, 53 and 55.

BRIEF FOR DEFENDANT IN ERROR, TENNEY, McCONNELL & COFFEEN, ATTORNEYS.

The cashier is not the bank's general agent, nor authorized to make contracts for it; he can not sell the bank's property, nor release a debt without payment; nor agree to pay a debt which the bank does not owe; nor admit forged bills to be genuine. Bolles on National Banks, Secs. 416, 542, 543, 551.

A cashier has no power, by his representations, to raise any obligation that would amount to a contract which is beyond his authority to make, directly and formally. 1 Morse on Banks, Sec. 167.

The president of a national bank has no power to bind it by a subscription to a fund to induce a paper mill company to locate its mill in the town in which the bank is situated. The officers of a corporation are merely agents, and have no authority to give away its funds, or apply them to a debt which the corporation does not owe. Robertson v. Buffalo Co. Nat'l Bank (Neb.), 58 N. W. Rep. 715.

The president of a national bank has no authority, as such, to make an agreement not within the usual course of business of the bank. Bolles on the National Bank Act, Sec. 58.

MR. PRESIDING JUSTICE SHEPARD DELIVERED THE OPINION OF THE COURT.

The plaintiff in error was a commission merchant doing business on the Chicago Board of Trade, and the defendant was a National Bank, at Dixon, Illinois.

Growing out of transactions hereinafter mentioned the former sued the latter for a balance of $780.75, to which suit a plea of set-off was interposed by the defendant, and at the conclusion of the plaintiff's case a verdict was rendered, by direction of the court, in favor of the defendant, for $2,197.22, and judgment was entered upon the verdict.

It appears that the plaintiff, at the direction of one R. C. Filson, of Dixon, Illinois, given in June, 1891, sold on the Board of Trade in Chicago, for Filson's account, 5,000 bushels of rye for delivery in September, 1891, and 5,000 bushels of rye for delivery in August of the same year. The account of the transactions was kept by plaintiff at the request of R. C. Filson in the name of W. S. Filson, though the latter, if such a person existed, never participated in the deal.

When R. C. Filson gave the order he stated to the plaintiff that he already had an equal or larger amount of rye contracted from farmers at a price affording a profit of five cents a bushel at the then prevailing market rates and wanted to sell against it for future delivery.

It also appears that as early as the latter part of July, shipments of rye by Filson, but in the name of the defendant, Dixon National Bank, began to be received by the plaintiff for sale on the market, and that from sales of rye so shipped to and received by the plaintiff net proceeds aggregating $3,209.40, were, from July 31st to August 24th, realized by the plaintiff and credited on plaintiff's books to the account of the defendant, the Dixon National Bank.

From the proceeds so realized the plaintiff deposited in the First National Bank of Chicago the sum of $1,012.18 to the credit of the defendant, and such sum deducted from what was realized, as above, leaves the balance for which the defendant had judgment.

Up to the time the rye began to come in from Filson in the name of the bank, the account of the sales for August and September deliveries continued to stand in the name of W. S. Filson, and those sales had been "margined up about ten cents a bushel."

The market had advanced, and Filson directed the plaintiff to hold the proceeds of rye shipped to him for sale as further margins against the sales for August and September.

As soon, however, as the plaintiff saw that Filson's rye was being shipped to him and billed in the name of the defendant bank, he notified Filson that such an application of the proceeds from shipments as he had directed could not be made without the authority of the bank in whose name it had been shipped and billed, and that he could not hold his trades for him in that way.

The evidence concerning what then took place consists partly in the testimony of the plaintiff, and partly in letters from the plaintiff to Filson and from Filson to the plaintiff.

Under date of July 29, 1891, Filson wrote to the plaintiff: " *   *   * You hold the proceeds of all this rye you are receiving until the excitement in rye is over, for I do not want you to get short and close it out just about the time it is ready to break. I ship'd you to-day car No. 4954, containing over 32,000 lb. rye."

And again on July 30th he wrote: " *   *   * As you know that rye has been sold against purchases here, and I suppose had I shipped you a 5 M. Aug. rye billed from D. N. B. (Dixon National Bank) you would not apply it on the sale. Now, sir, I want you to hold the net proceeds of the rye shipped you as margins, and if you buy that rye in I will most assuredly hold you responsible. You can credit the sale of 5 M. Aug. & 5 M. Sep. rye to acct. D. N. B. as they are advised of sale at time it was made and was satisfactory. *   *   * I want this rye shipped to margin that rye for a time yet, and if the rye goes to $1.00 per bus. or over, I have plenty of cheap rye yet to come in to fill those sales at a profit. Therefore I want you not to buy in that rye at these prices. *   *   * "

This last letter was answered July 31st by the plaintiff (by letter apparently addressed to W. S. Filson, but replied to by R. C. Filson,) asking for authority from the Dixon National Bank for the transfer of the trades for August and

Morris v. Dixon Nat. Bank.

September delivery to its account and the holding of the proceeds of the rye as it arrived as margins for those trades, and in the letter it was said that plaintiff held $1,065 to the credit of the account standing in the name of W. S. Filson.

Then on August 2d, (Sunday intervening) R. C. Filson replied to plaintiff as follows:

"You will transfer the W. S. Filson acc. to acc. D. N. B. less $56.25, which you will retain as margins on the 5 M. Sept. oats. The bank will also write you in regard to holding proceeds of rye already shipped."

And under the same date a second letter wherein Filson wrote: "I was over and consulted with Mr. Hawley, cashier D. N. B., and you will hear from him either by letter or telegram. He had written a telegram but it was after the board had closed Sat. and it was no use then to send it, and he will write you to-day and advise you as regards margins."

These letters clearly show the authority of Filson, for the transfer of the trades or sales standing in the name of W. S. Filson for August and September delivery of rye to the account of the Dixon National Bank, together with the money standing to the credit of those trades as margins, and for the application of the proceeds of rye shipped and to be shipped as further margins.

For the purpose of showing the authority of the bank to such transfer and application and its adoption thereof, the plaintiff offered in evidence a large number of identified letters and telegrams which passed both ways between the plaintiff and James A. Hawley, the cashier of the Dixon National Bank, between August 2 and October 2, 1891, but the offer was excluded, and neither of the letters or telegrams were permitted to be read.

That such letters were material to the issue, if the transactions were within the authority of the cashier of the bank, and, if so, were not *ultra vires* as to the bank, it is only necessary to read the first one of the series of letters that were offered, as follows:

"JASON C. AYRES,                    JAMES A. HAWLEY,
          Pres't.                              Cash'r.
            THE DIXON NATIONAL BANK.
                 Capital $100,000.
                         DIXON, ILL., Aug. 1st, 1891.

H. I. MORRIS & Co., Chi.

DEAR SIRS :—Mr. R. C. Filson says he will transfer sale of rye for Aug. & Sept. to ᵃ/c this bank, and the margins of $1,065, in your hands. If so, you can margin up to 75c. if necessary, and write me it has been done and the $1,065 has been placed to our credit. Write by return mail and advise me as to what you think of market for rye during month.

                    Yours truly,
                         JAS. A. HAWLEY, Cas."

The remainder of the correspondence that was offered, but refused, leaves no room for doubt but that Hawley, the cashier, was kept fully advised and participated in the subsequent transactions, and that not until the last did he attempt to shirk responsibility. The single letter from him which we have quoted is no more corroborative of such a conclusion than are numerous others written by him.

So authorized, the plaintiff transferred the Filson account to the name of the defendant bank and credited it with $1,009.53 (which was the mentioned sum of $1,065 standing to the credit of the Filson account, less a deduction that was explained to the expressed satisfaction of Hawley), and with all sales of rye from July 31st to August 24th, shipped to the plaintiff.

Against such credits the bank was charged with $1,012.18 deposited to its credit in the First National Bank of Chicago, and with what plaintiff paid to buy in the rye sold for August and September delivery.

If the rejected correspondence had been received in evidence it would have corroborated plaintiff's testimony, by telegram and letter from Hawley, that the purchase of the August rye was made at Hawley's direction. The September rye was bought by plaintiff under the rules of the Board of Trade for lack of margins, and the account was closed

with a balance of $780.75 against the bank, and for that balance the suit was brought.

Shortly after the transfer of the trades to the account of the bank, a personal interview in the office of plaintiff occurred between Hawley and the plaintiff concerning the transferred trades and the course to be followed in the future with reference to them, at which interviews Hawley requested that he should be kept informed as to the course of the market by telegraph, and that Filson should also be kept posted as well as the bank, and at the same time Hawley told plaintiff that more than all the rye that had been sold for these deliveries had been contracted from farmers for delivery.

The theory upon which the offered correspondence between the plaintiff and Hawley, the cashier of the defendant bank, was refused admission, seems to have been either that the cashier, as such, had no authority to engage the bank in the particular transactions, or that such transactions were as to the bank *ultra vires*, or both.

Mr. Ayres, the president of the bank, was called as a witness for the plaintiff, and testified with reference to the transactions, that as to their details he had no knowledge; that he knew the bank, through the cashier, was advancing money to Filson, by the way of loans to him, to buy grain to be shipped and sold in the name of the bank by the car lot; that the method of doing the business was that Filson would buy the grain, load it, and when a car was loaded would deliver the bill of lading to the bank and draw his check upon the bank; that the grain was Filson's, but was held by the bank under the bills of lading as security for money advanced; that Filson did the shipping and selected the person in Chicago to whom the shipment was made.

It does not appear how much money the bank advanced on a car-load, or a bushel, and is not known by us how much of an equity, so to speak, remained to Filson in the grain, at its cost price.

Such transactions as the president described are in the

interest of commerce and trade and are recognized as a part of the legitimate business of banking.

It need not be determined here, and perhaps need not be discussed, whether a national bank, in loaning money to its customers engaged in such enterprises as buying grain in the country and shipping it to market, might, without exceeding its powers, make sales of grain for future delivery, for its customers, in anticipation of the receipt of grain already contracted for from the growers of it, and upon which it was to make advances when it should be delivered.

That was not what was done by the bank in this case.

Before it had any connection with the transactions involved in this suit, its customer, Filson, had sold ten thousand bushels of rye for future delivery.

In that transaction there would be a profit or a loss depending upon the course of the market. The bank had the lawful right and power to loan money to Filson and to take as much security as it could get. It also had the right to release unto Filson any part of the security received from him.

If, therefore, in the course of their mutual transactions it was arranged that the contracts of sales for future delivery into which Filson had entered should be transferred to the bank by way of security for advances made or to be made by the bank, or that the proceeds derived from the sales of rye shipped and sold by the bank for Filson's benefit, although held as security, should be applied to Filson's use in the protection of his contracts for future delivery, it did not necessarily make the bank a dealer in Board of Trade options, or a seller of property for future delivery.

What the fact was about the transactions was clearly a question for the jury under proper instructions by the court as to the law, and it was error for the court to take its consideration from them.

For the determination of that fact the excluded letters and telegrams were, as appears from an inspection of them, most material, and it was error to refuse to admit them in evidence.

As to the authority of the cashier in the premises, that was likewise a question for the jury upon the evidence and under appropriate instructions.

Hawley had been cashier of the defendant bank for " a number of years previous " to the time of these transactions and was also one of its directors and stockholders.

The testimony of the president of the bank leaves no doubt but that Hawley, as cashier, was the principal manager and director of the bank's business, and the by-laws of the bank, introduced in evidence, prescribe his duties.

In the absence of proof to the contrary it would be entirely competent for a jury to find that the cashier had the right to direct and transfer the exchanges of the bank from one person to another, and in the exercise of that right to direct the application of the exchange from grain into money which it had received in another city, to the use of one of its customers.

The judgment of the Circuit Court will be reversed and the cause remanded.